Elijah M. Watkins (ISB No. 8977)
Aaron R. Bell (ISB No. 10918)
DORSEY & WHITNEY LLP
101 South Capitol Boulevard Suite 1100
Boise, ID 83702
Telephone: (208) 617-2550
Watkins.Elijah@dorsey.com
Bell.Aaron@dorsey.com

Latonia Haney Keith (ISB No. 9721)
McKay Cunningham (ISB No. 10178)
877 W. Main Street, Suite 503
Boise, ID 83702
Telephone: (512) 983-8000
lhaney@post.harvard.edu
cunninghammckay@gmail.com

*Attorneys for Plaintiff Sarah Inama*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SARAH INAMA, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>IDAHO STATE BOARD OF EDUCATION, an agency of the State of Idaho; IDAHO STATE DEPARTMENT OF EDUCATION, an agency of the State of Idaho; RAUL R. LABRADOR, in his official capacity as the Attorney General of the State of Idaho; WEST ADA SCHOOL DISTRICT a political subdivision; DR. DEREK BUB, in his official capacity as Superintendent of West Ada School District; MONTY HYDE, in his official capacity as the Principal of Lewis & Clark Middle School,<br><br>Defendants. | Case No.<br><br>**COMPLAINT** |

Plaintiff Sarah Inama (<u>Inama</u> or <u>Plaintiff</u>), by and through her undersigned counsel of record, and for causes of action and claims for relief against Defendants the Idaho State Board of Education (<u>IBOE</u>); Idaho State Department of Education (<u>IDOE</u>); Raul R. Labrador, as the Attorney General of the State of Idaho (<u>AG Labrador</u>); West Ada School District (<u>West Ada</u>); Dr. Derek Bub (<u>Superintendent Bub</u>); and Monty Hyde (<u>Principal Hyde</u>) (collectively <u>Defendants</u>) complains and alleges as follows:

## INTRODUCTION

Sarah Inama is an award-winning middle school teacher. In 2021 she visited the seasonal classroom display section of an arts and crafts store where she purchased a multi-pack of motivational posters to hang in her sixth-grade world studies classroom at Lewis & Clark Middle School (<u>School</u>). One of the posters read "in this room everyone is welcome, important, accepted, respected, encouraged, valued, equal" (<u>Equal Poster</u>). Another poster read "Everyone is welcome here" above 10 hands with various skin colors and a heart in each palm (<u>Welcome Poster</u>, collectively the <u>Posters</u>). Ms. Inama placed the Posters on the walls of her classroom next to world maps, an American Flag, and a pink sign with flowers that read "I am rooting for you."

No student, parent, teacher, or administrator ever complained about the Posters. On the contrary, Ms. Inama was widely seen as an outstanding teacher. She served as the chair of the social studies department, the lead sixth grade teacher, the advisor to the National Junior Honor Society, was repeatedly rated "distinguished" in supervisor evaluations, and was featured on the School's official social media account for the "positive climate and culture for staff and students" she had created.

In 2022, West Ada adopted Board Policy 0401.20 (<u>Speech Policy</u>), that prohibited the display and teaching of "controversial issues" and the "advancement of individual beliefs," but

allowed for the display of content neutral "motivational posters." No one ever claimed that Ms. Inama violated the Speech Policy by displaying the Posters. In or around January 2025 the Idaho Legislature introduced House Bill (HB) 41: proposed legislation that purported to outlaw "flags" or "banners" that expressed "ideological views" about race or politics. When School administrators learned of HB 41, they preemptively ordered Ms. Inama to remove the Posters, purportedly for being violative of the Speech Policy. When asked why, West Ada and School administrators clarified that "not everyone agrees that 'everyone is welcome', so it is a political opinion" "that not everyone shared." West Ada and School administrators further stated that "Political environments change. What may not have had a political message in the past could be one now," and that "the color of the hands is crossing the political boundary."

HB 41 was later interpreted by AG Labrador to encompass the Welcome Poster. In an Op-Ed for Fox News later republished on the Attorney General website, AG Labrador alleged that the Welcome Poster was "DEI messaging disguised as inclusion" and that it "mask[s] a comprehensive worldview that undermines parental authority over children's moral development." On March 28, 2025, Governor Brad Little signed the law into effect, now codified as Idaho Code § 33-143 (Speech Law, collectively with the Speech Policy, the Speech Regulations).

Ms. Inama refused to comply with the Speech Regulations. After initially taking the Posters down as ordered, several students, including two non-white sixth grade girls, asked Ms. Inama why she removed the Posters. Ms. Inama did not have an answer. After days of tears and emotional turmoil, Ms. Inama put the Posters back up. As a result, West Ada administrators and AG Labrador spoke out against her, claimed she was insubordinate, a political operative, and subjected her to public ridicule and multiple interviews with superiors—including pulling her out of class in front of her concerned students. Owing to mounting pressure, Ms. Inama resigned.

Ms. Inama now brings this lawsuit seeking declaratory and injunctive relief that the Speech Law is unconstitutionally vague and overbroad in violation of the First Amendment of the United States Constitution as incorporated by the Fourteenth Amendment, is violative of the Fourteenth Amendment's Due Process Clause, both facially and as applied, and is a violation of the Constitution of the State of Idaho.

## PARTIES

1.      Plaintiff Sarah Inama is an individual residing in Ada County, Idaho.

2.      Defendant Idaho State Board of Education, is responsible for the general supervision, governance and control of all state educational institutions, including the enforcement of the education laws of the state, including Idaho Code § 33-143. I.C. § 33-101, 116.

3.      Defendant Idaho State Department of Education is responsible for carrying out policies, procedures, and duties authorized by law or established by the State Board of Education for all elementary and secondary school matters. I.C. § 33-125.

4.      Defendant Raúl Labrador is the Attorney General of the State of Idaho. He is sued in his official capacity. As Attorney General, he has the authority to enforce and interpret Idaho law, including the challenged statute, Idaho Code § 33-143.

5.      Defendant West Ada School District is a political subdivision of the state of Idaho responsible for operating public schools within its district, including Lewis & Clark Elemntary School.

6.      Defendant Dr. Derek Bub is an individual residing in Ada County, Idaho. He is sued in his official capacity. At all times relevant to this action he was the superintendent of West Ada School District.

7.      Defendant Monty Hyde is an individual residing in Ada County, Idaho. He is sued in his official capacity. At all times relevant to this action he was the principal of Lewis & Clark Middle School.

## JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, as this is a civil action arising under the Constitution of the United States, and pursuant to 28 U.S.C. 1343(a)(3), as this is a civil action seeking redress for the deprivation, under color of state law, statute, ordinance, regulation, custom or usage, of the rights set forth in the First and Fourteenth Amendments to the Constitution.

9.      The Court has supplemental jurisdiction over the state law claims in this case pursuant to 28 U.S.C. § 1367 as they arise from the same operative facts and controversy.

10.     The Court has personal jurisdiction over all parties as they are either persons residing in or are the agencies/officials/employees of the state and political subdivisions of the State of Idaho.

11.     Venue of this matter is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because the defendants in this case are the political subdivisions or actors of the State of Idaho and the events giving rise to the complaint occurred entirely in Idaho, including the interpretation and enforcement of the statute at issue, Idaho Code § 33-143.

## FACTUAL ALLEGATIONS

### A.  Ms. Inama is a "Distinguished" Teacher

12.     Ms. Inama was, at relevant times, a teacher employed by West Ada and is still a teacher in Idaho. At the time of the contested events, she taught at the School in Meridian, Idaho.

13.     Ms. Inama was hired in or around 2019 at the School where she would eventually become a world studies teacher.

14.     As they did with all teachers, School and/or West Ada administrators conducted extensive performance evaluations of Ms. Inama for each spring and fall semester in 2021, 2022, 2023, and 2024.

15.     When asked to evaluate Ms. Inama's ability to create "an environment of respect and rapport" and "manag[e] student behavior" in her classroom, evaluators repeatedly ranked her as "Innovating / Distinguished", the highest recognition possible.

16.     Administrators praised Ms. Inama for being "sensitive to individual student needs" and for being respectful to "students' dignity." She was recognized as having "genuine warmth, caring, and sensitivity to students as individuals," resulting in "an environment where all students feel valued and are comfortable taking intellectual risks."

17.     Ms. Inama was lauded as she "frequently volunteers to participate in school events and school district and community projects," resulting in "events that positively impact school life."

18.     Importantly, evaluators vouched for Ms. Inama as being "counted on to hold the highest standards of honesty, integrity," and noted that she "makes a concerted effort to challenge negative attitudes or practices to ensure that all students, particularly those traditionally underserved, are honored in the school."

19.     Administrators appointed Ms. Inama to serve as the social studies department chair.

20.     Administrators appointed Ms. Inama to serve as the teacher lead for all other sixth grade teachers.

21.     Ms. Inama served as the National Junior Honor Society advisor, where she led a student group in multiple fundraising and volunteer activities, including volunteering to make weekend food bags for children.

22.    Ms. Inama helped create a closet at the School filled with gently used clothing so low-income students could go "shopping" for items they needed, like coats, gloves, and shoes.

23.    In November 2024, the School featured Ms. Inama on its social media, gifting her the "you rock" award for helping to "create a positive climate and culture for staff and students," stating that "[h]er efforts have a huge impact on…overall school environment."



24.    From her date of hire, Ms. Inama maintained a classroom environment regarded as supportive, welcoming, and inclusive for all her students — regardless of race or ethnicity.

**B.  The Public Education Framework in Idaho**

25.    West Ada is the largest school district in Idaho.

26.    Along with the School, West Ada operates some 58 schools servicing approximately 40,000 students from preschool through 12th grade spread across Boise, Eagle,

Star, and Meridian, Idaho.

27.    The IDOE oversees all districts in Idaho, including West Ada.

28.    IDOE is the executive arm of the IBOE, which is responsible for setting policy for education within the State.

29.    IBOE and IDOE enforce policy and control districts, along with the employees therein, through audits, site visits, funding, licensure, and formal disciplinary proceedings.

30.    Throughout the events of the complaint, Ms. Inama was answerable to her School and West Ada, who in turn are answerable to IDOE—the executive arm of IBOE.

## C. A Pattern and Practice of Unwelcoming Behavior in West Ada

### i.    Seven Oaks

31.    Seven Oaks Elementary School (Seven Oaks) is a West Ada school.

32.    In or around January 2025, Seven Oaks displayed a bulletin board as part of the district's multilingual learners program depicting various flags, rainbows, hands with different



skin tones and encouraging phrases (<u>Seven Oaks Display</u>).

33.    One poster in the Seven Oaks Display states, "Everyone is welcome here" below a rainbow and above hands with different skin tones. Another says "Be kind," surrounded by hands with different skins tones forming a heart. A third tells students, "In this room you belong here, you matter, you are worth it, you are important, you are loved, you have a voice, you are valued, you are respected," with each phrase shown in a different color. A fourth reads "better together," with multi-colored and flesh-toned hearts.

34.    As part of the Seven Oaks Display, four flags hung on the bulletin board representing the United States, Mexico, Colombia, and Tanzania, reflecting the countries of origin of some Seven Oaks students.

35.    On or about January 24, 2025, the "@WestAdaParents" Instagram, an anonymous account that has since been deleted, posted a picture of the bulletin board criticizing the display of "sexual rainbows" and for exposing children to "LGBTQ propaganda at elementary school."

36.    Using its official "@westadaschools" account, West Ada informed the anonymous "@WestAdaParents" that the Seven Oaks Display was being removed in violation of West Ada's Speech Policy.

37.    @westadaschools further commented the "Speech Policy 401.20 is not about exclusion but rather about ensuring that no group or individual is left out."

38.    West Ada's handling of the Seven Oaks Display was covered by media outlets.

### ii.    *Eagle High School*

39.    Eagle High School (<u>Eagle High</u>) is a West Ada school.

40.    In December 2024, West Ada was sued as a result of the alleged "deliberate indifference to the racial harassment and bullying endured" by non-white students who suffered "continuous" harassment and racial epithets "without fear of reprisal" (<u>Eagle High Lawsuit</u>)

41.    According to the Eagle High Lawsuit , non-white students were singled out because of the color of their skin, insulted with racial slurs, including the N-word, and Eagle High administrators who were aware of the hate speech were ineffectual at curtailing the behavior.

42.    The Eagle High Lawsuit was covered by media outlets.

43.    The media also covered a second lawsuit—a Hispanic athlete at Eagle High whose "brown fingertips" were made the butt of jokes—and students from another West Ada school who were referred to by the N-word and told to go "pick cotton".

### iii.    Lewis & Clark Middle School

44.    In or around 2022, when teaching a unit on ancient eastern history, Ms. Inama proposed having a guest speaker come to her class and explain the origins and purpose of acupuncture to her students.

45.    Principal Hyde, shot down the teaching opportunity, claiming that "people might think it was voodoo," or words to that effect.

46.    In or around February 2022, Ms. Inama put up a large piece of butcher paper in the cafeteria to help celebrate counseling appreciation week and encouraged students to write their names and/or words of appreciation.

47.    While many positive comments were written by students, someone had written the N-word multiple times.

48.    Ms. Inama took the butcher paper down and expressed her concern to her next class, asking students to come forward if they had any information as to who wrote the racial slurs.

49.    At least five different students independently came forward and named the same student as the one writing the racial slurs.

50.    Ms. Inama reported the student to School administrators, the student denied wrong doing, and School administrators took no further action.

51.    On another occasion in 2025, Ms. Inama overheard children talking about a lunchtime game they had made up called "border jumping."

52.    After hearing about the "border jumping" game, Ms. Inama explained how such a game might make others feel, and she encouraged the students to come up with a different activity, which they did.

53.    On a student survey conducted in or around 2024, the School received the lowest marks on questions asking students whether other students "are nice or show respect to each other at my school" and whether the students felt excited to be at school.

**D. The School Makes Effort to Address Its Unwelcoming Atmosphere**

54.    Administrators tried to address the unwelcoming atmosphere at the School.

55.    Principal Hyde held a meeting with School faculty and staff and addressed the poor survey results that showed students did not feel welcome.

56.    Principal Hyde proposed that teachers could give up their lunch and run programs during the lunch hour that would help students feel more excited to be at school.

57.    Ms. Inama was one of only a small group of teachers who was already volunteering to give up her own lunch to run welcoming programs for students.

58.    Ms. Inama created the "Gal Pals Lunch Bunch," a "drama free zone" where girls could come and eat lunch in Ms. Inama's class, free from ridicule.

59.    The School also emphasized the "Explorer Way" to encourage students, teachers, and staff to act in ways that fostered a safe, friendly and welcoming environment.

60.    The "Explorer Way" was a mission statement created by a School administrator. The School administrator's spouse designed an "Explorer Way" poster that was distributed throughout the School and displayed in classrooms and public spaces.

61.    The first principle under the "Kind" pillar of the Explorer Way encourages students

and teachers to "welcome others and embrace diversity."



## E. Ms. Inama Hangs Motivational Posters to Help Kids Feel Welcome

62.    In or around 2021, Ms. Inama visited the seasonal classroom display section of an arts and crafts store.

63.    There she found and purchased a pack of posters.

64.    One poster read "In this room, everyone is welcome, important, accepted, respected, encouraged, valued, equal", with each word set against a different background color.



65.     Another poster read "Everyone is Welcome Here" and featured graphic depictions of raised hands in a variety of skin tones with a single red heart in the palm of each hand.



66.     The Posters—including the Welcome Poster—were in line with the School's "Explorer Way," which was to "welcome others and embrace diversity."

67.     Ms. Inama hung the Posters in her classroom.

68.    Until the events described in this complaint, no student, parent, teacher, or administrator ever lodged a single complaint about the Posters for years.

69.    Ms. Inama hung other materials on her walls as well.



70.    The Posters were not unusual in size or placed in a manner that would otherwise draw more attention to them than other signs placed in the classroom. Instead, the Posters were smaller in size than the other materials on the wall and were just one of many things on display.







71.     Unlike the world maps in Ms. Inama's classroom which serve the non-communicative purpose of displaying the location of countries and oceans in relation to one another, the Posters are inherently communicative in that they serve no other purpose than to speak the motivational message that all students, regardless of background, are welcome to attend and receive a free, high-quality public education in Ms. Inama's classroom

72.     Upon information and belief, no student ever complained that Ms. Inama's classroom felt unwelcoming.

73.     Upon information and belief, no parent ever claimed that their child felt unwelcomed in Ms. Inama's classroom.

74.     No School or West Ada administrator ever told Ms. Inama that her classroom was an unwelcoming environment.

**F.  The Speech Regulations**

75.     In or around 2022, West Ada adopted the Speech Policy which allows teachers to display "motivational posters," but prohibits the display of "controversial issues" and the

"advancement of individual beliefs."

76.    Prior to the events of this complaint, no one ever suggested that the Posters were in violation of the Speech Policy.

77.    On or about January 23, 2025, Representative Ted Hill (<u>Representative Hill</u>) introduced HB 41, which purported to limit "political" and "ideological" speech in schools through the prohibition of certain flags and banners.

78.    As it had the potential to directly impact schools, the proposed legislation was known to and tracked by school districts across the state, including West Ada beginning in or around January 2025 until it was signed into law by Governor Little on or about March 13, 2025, now codified as Idaho Code § 33-143.

79.    Under the Speech Law: "No flags or banners that represent political, religious, or ideological views, including but not limited to political parties, race, gender, sexual orientation, or political ideologies, may be displayed on public school property such as classrooms, hallways, entryways, or sports fields."

80.    The Speech Law defines a "banner" as "a long, rectangular, or square piece of fabric, paper, or other material, often displayed in a vertical or horizontal manner, used to convey a message, symbol, emblem, or representation of an institution or a political, religious, or ideological expression, or used to announce or celebrate an event or achievement."

81.    AG Labrador would go on to interpret and provide guidance that the broad definition of "banner" was "not limited to just a rectangular or square shaped item; it also includes a 'long' item" that is "larger than usual regardless of its shape."

82.    The Speech Law does not define "ideological" or "political."

83.    The IDOE oversees the enforcement of the Speech Law and is tasked with

removing speech deemed to be in violation.

**G. The Speech Regulations are Enforced Against Ms. Inama**

84.     After HB 41 was introduced on January 23, 2025, on Wednesday, January 29, 2025, Ms. Inama attended a West Ada Professional Learning/Collaboration Day at another West Ada school along with other teachers from West Ada.

85.     Upon information and belief, while Ms. Inama was away from the School, and unbeknownst to Ms. Inama at the time, Principal Hyde and Heather Fisher (Vice Principal Fisher) walked through classrooms at the School, looking for materials that they believed violated the newly-introduced HB41.

86.     On Monday, February 3, 2025, Principal Hyde and Vice Principal Fisher approached Ms. Inama in her classroom during the lunch hour.

87.     Principal Hyde explained that "the way things are now," Ms. Inama's Posters were no longer allowed because "they express an opinion that not everyone agrees with" or words to that effect.

88.     Ms. Inama responded that that "sounds racist to me," to which Principal Hyde responded "yeah, I know it's a bummer."

89.     Principal Hyde explained that the notion that "Everyone is Welcome Here" was not something that everybody believed and was therefore a personal opinion in violation.

90.     Principal Hyde ordered Ms. Inama to remove the Posters immediately.

91.     Upon information and belief, Principal Hyde required Ms. Inama to remove the Posters not just pursuant to the Speech Policy, but also to preemptively ensure compliance with the recently-introduced HB 41.

92.     After receiving the direct order, Ms. Inama went into the hallway and cried.

93.     The bell rang and Ms. Inama's students reentered her classroom.

94.     Complying with the direct order of her superior, Ms. Inama turned on an educational video for her students and discreetly removed the Posters during the video.

95.     Multiple students, including two non-white sixth grade girls noticed that the Posters were no longer displayed and asked Ms. Inama why she had removed them.

96.     Other than saying that she was directed to take down the Posters, Ms. Inama could not and did not explain to the students why or how the Posters violated the Speech Regulations.

97.     On or about Wednesday, February 5, 2025, Ms. Inama emailed Principal Hyde requesting an explanation on why she was ordered to remove the Posters and whether the removal was sparked by a complaint from a student, parent or administrator.

98.     Principal Hyde responded that there had not been any complaints made about her or the Posters.

99.     Ms. Inama followed up, requesting further clarification from Principal Hyde on which specific portions of the Speech Policy her actions violated.

100.    Principal Hyde did not respond.

101.    Ms. Inama suffered emotional distress for days after complying with the directive to remove the Posters, feeling that she was being ordered to condone, and was complicit in, racist sentiments.

102.    On Saturday, February 8, 2025, Ms. Inama went to her classroom with her husband and their 15-month-old baby and rehung the Posters.

103.    Ms. Inama then sent an email to Principal Hyde that same day, informing him that she had "lost quite a lot of sleep over this matter and ha[d] struggled with it deeply," and that she "would die to know that any students felt like I had changed my stance" on whether those students

should feel welcomed in her classroom regardless of their background.

104.   Ms. Inama told Principal Hyde that she had rehung the Posters.

105.   On Monday, February 10, 2025, Principal Hyde confronted Ms. Inama after school in her classroom and explained that she was guilty of insubordination, a charge that could result in disciplinary action, and that he would be bringing in West Ada administrators to meet with her as a result.

106.   On Thursday, February 13, 2025, Ms. Inama met with Principal Hyde and Marcus Myers, Chief Academic Officer for West Ada and a member of the executive team (Chief Myers), in her classroom.

107.   According to notes taken during the meeting, Chief Myers explained that "Political environments change. What may not have had a political message in the past could be one now. [the] [m]oment we present a political or personal belief we violate the law…the color of the hands is crossing the political boundary."

108.   Upon information and belief, the "law" Chief Myers was referring to was HB 41, which would eventually become codified as the Speech Law.

109.   Ms. Inama responded that it is "gross to say that we need to remove hands representing colors of all students in our school…[She] doesn't agree that the skin tone is a political message…She doesn't want to appease bigoted people…[She] says it is important to her that she not crumble to something that feels racist."

110.   Chief Myers then explained that he would get West Ada's legal counsel, Amy White, and West Ada's Chief Human Resources Officer, Renee Senander (Chief Senander), involved.

111.   Chief Myers instructed Ms. Inama to write an email defending the Posters.

112.    On February 14, 2025, Ms. Inama provided the ordered written statement to Chief

Myers and Principal Hyde:

> I have never had one complaint about [the Posters]….the purpose of this poster is
> to foster a positive and inclusive learning environment…per my discussions with
> Marcus Myers and my building's administration this poster apparently conveys a
> political message because the political environment 'ebbs and flows' and what is
> considered controversial changes with that political environment. What I don't
> understand is why district policy has to follow that 'ebb and flow' and why it has
> to be reinterpreted every time the political environment changes. If this poster is
> considered controversial because in today's political environment there are people
> that have differing views of the phrase 'everyone is welcome' in regard to race, that
> is to say that there are people that believe not everyone is welcome (no matter their
> skin color) is welcome. If you are interpreting this policy to protect people with that
> differing view, you are protecting racist sentiments and sending a clear message
> that you are not only not opposed to racism affecting district policy but you are
> upholding it…If I was a person of color…I would personally be offended. I would
> also be furious and terrified knowing that my child's existence in school and
> whether or not they are unconditionally welcomed is now seen as a political
> view….

113.    Following Ms. Inama's email, West Ada once again determined that the Posters

needed to come down.

## H.  Ms. Inama's Story Makes National News, West Ada Tries to Make the Story Go Away

114.    On January 30, 2025, just days after HB 41 was introduced, Superintendent Bub

appeared on the Ranch Podcast, an amateur local podcast hosted by Matt Todd (Todd).

115.    During the interview, Todd questioned Superintendent Bub on recently introduced

legislation from Representative Hill about speech and displays in Idaho schools.

116.    Touting the Speech Policy, Superintendent Bub explained that West Ada wants to

create a "distraction free environment" including by restricting posters in West Ada classrooms

outside of those that directly "support learning".

117.    Superintendent Bub explained that posters which convey an inclusive and

welcoming message, violate the Speech Policy because it is "hard to determine how one kid feels

about any type of political sign."

118.    Superintendent Bub explained that he walks West Ada classrooms to ensure compliance and relies on administrators to help manage it.

119.    On or about March 10, 2025, local media outlets began reporting on the Speech Regulations and Ms. Inama being forced to take the Posters down.

120.    The story would eventually make national headlines.

121.    West Ada responded that while the phrase "Everyone is Welcome Here" itself is broadly positive, "certain design elements" (e.g., graphics of multi-racial hands) "have been associated over time with political entities and initiatives that are now subject to federal restrictions," and thus were no longer "content-neutral" as required under the Speech Policy.

122.    On March 12, 2025, West Ada sent a letter to staff, including Ms. Inama, explaining that visual displays should be managed like a "rulebook" and, using a sports-team metaphor, when someone does not follow the rules, they are not a team player, clearly referring to Ms. Inama.

123.    Refusing formal media inquiries, on March 13, 2025, Chief Myers went on the Ranch Podcast.

124.    During his interview Chief Myers explained that the words "Everyone is Welcome Here" were not the issue, but rather it was the inclusion of the hands with varying skin tones that was so problematic.

125.    On March 14, 2025, West Ada Trustee Dave Binetti (Trustee Binetti) also appeared on the Ranch Podcast, agreed with Chief Myers' position, referred to Ms. Inama specifically by name, and explained that it is important not to have "questionable things" (referring to the Welcome Poster) in classrooms, and further explained that the Speech Policy is "particularly germane because there is now going to be a law…that is specifically prohibited against exactly the

type of signage that's in question. And we want to get ahead of this, we don't want to be in violation of the law."

126.    Upon information and belief, "the law" that Trustee Binetti was referring to was the Speech Law.

127.    On the same day Trustee Binetti's Ranch Podcast interview aired, March 14, 2025, Ms. Inama was outside with her students competing in the "Olympics" following a study on ancient Greece.

128.    Without warning, Ms. Inama was approached by Principal Hyde and another School faculty member who told her that she needed to go inside to meet with Superintendent Bub and that another teacher would be taking over her class.

129.    Ms. Inama's students, some of whom may have been aware of the media coverage surrounding their classroom, questioned in a worried tone if Ms. Inama was going to be alright. She comforted the children and left them with the replacement faculty member.

130.    Ms. Inama was then ushered into a conference room with Superintendent Bub, Principal Hyde, and Chief Senander from HR.

131.    According to notes taken during the meeting, Superintendent Bub explained that the Speech Policy is to be in the "'neutral' zone," but admitted that the "Speech Policy is not always perfect."

132.    Superintendent Bub then explained that "[a]bout 8-months ago, [a] lawsuit for racial issues at EHS" named the Principal and teachers at EHS. Superintendent Bub went on to explain that an assistant principal decided to "'fix the culture' at the school," so the teacher took students to the Wassmuth Center for Human Rights "to find out what we do to build culture at EHS." Superintendent Bub then made a point to highlight that a "records request was made" and

that "a smear campaign with all of the admin's background [was] posted online."

133.    Superintendent Bub explained that he just wanted to protect Ms. Inama from a similar "smear campaign", but if she did not relent on the Welcome Poster issue, Superintendent Bub would not be able to protect her.

134.    Ms. Inama took this as a threat.

135.    Upon information and belief, the "lawsuit for racial issues at EHS" that Superintendent Bub referenced was the Eagle High Lawsuit.

136.    Upon information and belief, Superintendent Bub asked for a "second chance" because the publicity surrounding the Posters added to an already negative public narrative about West Ada as an unwelcoming place given the Seven Oaks Display and the Eagle High Lawsuit.

137.    Superintendent Bub proposed that Ms. Inama replace the Posters with a "neutral sign" created by West Ada containing speech that Superintendent Bub approved and agreed with.

138.    Superintendent Bub explained that "the words are fine but the graphics [of the hands with different skin tones] can be taken politically."

## I.  The Public Rallies Behind Ms. Inama

139.    Between March 10 and March 25, 2025, West Ada received over 1,200 emails about the Posters.

140.    All but two were in support of Ms. Inama.

141.    Students organized protests, and parents and students addended a West Ada board meeting.

142.    During the board meeting, Trustee René Ozuna said she supported the Posters and never anticipated that "a message of inclusion or words in primary colors could be seen as political," while Trustee Binetti defended enforcing the Speech Regulations, claiming teachers can

abuse their influence to push political views.

143.    On or around March 23, 2025, various students, administrators, and members of the public staged a "Chalk the Walk" at West Ada's offices, drawing hands of varying skin tones on the sidewalk under the words "Everyone is Welcome Here".

144.    The next day, on March 24, 2025, West Ada dispatched custodial staff to remove the inclusive messages with pressure washers, calling it vandalism.

145.    Ms. Inama did not organize or initiate any of the public protests or actions.

## J.  Ms. Inama Resigns as a Result of West Ada's Treatment

146.    Despite overwhelming public support, West Ada refused to change its position on the Posters.

147.    On May 9, 2025, Ms. Inama announced her resignation from the School.

148.    In an email to Principal Hyde, Superintendent Bub, and others at West Ada, Ms. Inama explained that she was sad to be leaving West Ada but that she "cannot align [her]self nor be complicit with the exclusionary views and decisions of the administration. It is extremely disturbing and embarrassing to see a district prioritize appeasing individuals with racist perspectives over celebrating the diversity and beauty of all our students." Ms. Inama refused to stay at West Ada and "be forced to comply with your ultimatum of finding a 'replacement for my poster' or face disciplinary action."

## K.  Attorney General Labrador and IDOE Interpret the Speech Law.

149.    Days after HB 41 passed the Senate, and shortly after Ms. Inama's story hit the media, the IDOE requested clarification from AG Labrador's office for guidance on the application of the soon-to-be codified Speech Law.

150.    On May 29, 2025, AG Labrador's office issued its opinion to the IDOE, which was subsequently released to the public on June 30, 2025.

151.    In interpreting the Speech Law, AG Labrador acknowledged that many of the terms in the statute were undefined and that the plain meaning or dictionary definition should be applied.

152.    With respect to the word "long" as used in the Speech Law, AG Labrador explained that because "'long' is separated from 'rectangular' by a comma, it does not describe the rectangle. Instead, it separately describes the banner material and must be considered or applied separately from rectangle and square. This means a banner is not limited to just a rectangular or square shaped item; it also includes a 'long' item…something elongated like an oval-shaped paper or something which is larger than usual regardless of its shape" could be interpreted to be a banner.

153.    AG Labrador defined "poster" as falling within the statutory definition of a 'banner.' Therefore, a poster should be treated as a banner for purposes of section 33-143."

154.    AG Labrador concluded that the "Welcome Poster" "cannot be displayed in Idaho schools" because the Posters "are part of an ideological/social movement which started in Twin Cities, Minnesota following the 2016 election of Donald Trump."

155.    AG Labrador alleged that "Since that time, the signs have been used by the Democratic party as a political statement. The Idaho Democratic Party even sells these signs as part of its fundraising and Ms. Inama has been displaying the posters since "2017" to "share her personal, ideological beliefs."

156.    According to internet historical records, the Idaho Democratic Party did not start selling the Welcome Poster until March 25, 2025, Ms. Inama did not start teaching until 2019, and Ms. Inama purchased the posters in or around early 2021.

157.    Ms. Inama has repeatedly affirmed her position in media interviews: "To say that 'Everyone is Welcome' in a public school system is not political, it's the law."

158.    On June 26, 2025, relying on AG Labrador's guidance, IDOE sent a formal letter

to all 115 school districts in Idaho providing guidance on the Speech Law and affirming IDOE's commitment to enforce it.

159.    Because the term is not defined in the Speech Law, the IDOE instructed districts to rely on the dictionary definition of "ideology" which, according to IDOE, was "A set of beliefs, usu[ally] relating to politics, economics, or society, that form the basis of policy or action; esp[ecially], a mindset or outlook that governs behavior."

160.    IDOE's definition is from Black's Law Dictionary, not a dictionary readily available to a school teacher trying to comply with the Speech Law and, upon information and belief, was the definition provided to IDOE by AG Labrador or his office.

161.    The IDOE explained that it "will consider whether the displayed flag or banner illustrates or shows someone's opinions, beliefs, emotions, or thoughts regarding politics, economics, society, faith or religion," and that a "poster" is included in the definition of "banner" for purposes of IDOE's enforcement of the Speech Law.

162.    On July 14, 2025, AG Labrador penned an Op-Ed for Fox News titled "One State's Bold Fight Against Classroom Indoctrination Targets 'Woke' Welcome Sign" and separately published the same on the official Attorney General's website (Op-Ed).

163.    In the Op-Ed, AG Labrador explained that while the Posters appear neutral with "simple, positive words that seem apolitical. [T]he design reveals its true purpose: colorful letters above imagery designed to signal adherence to Diversity, Equity and Inclusion. The rainbow colors and progressive symbols accompanying these messages make their political purpose unmistakable" and "reflect a broader ecosystem of political resistance groups launched in protest of the political rise of President Donald Trump…. These seemingly neutral terms mask a comprehensive worldview that undermines parental authority over children's moral development."

164.    Although West Ada repeatedly claimed that the Posters were political because of the inclusion of hands with different skin tones and never took issue with sexual identification, in the Op-Ed AG Labrador did not mention race, but instead complained of "organization[s] dedicated to advancing transgender ideology among children and families," and "Related movements like 'Everyone is Welcome' similarly incorporate symbols from the 'Intersex-Inclusive Pride Flag' and promote LGBTQ+ ideology through educational messaging."

## L. Districts and Teachers Are Defiant, the Speech Law is Inconsistently Applied, and Elected Officials Threaten Educators

165.    Founded in 1865 before Idaho became a state, Boise School District (BSD) is one of the oldest and the second largest school district in Idaho, serving over 22,000 students across 48 schools in Boise, Hidden Springs, Garden City, and Eagle, Idaho.

166.    On July 10, 2025, BSD publicly issued a memo (BSD Memo) to families within the district explaining that the Speech Law, and IDOE's guidance, include "broad definitions of 'banner,' 'poster,' and 'expression,' [and that the] question was also raised as to whether or not the popular 'Everyone is Welcome Here' sign would be banned under the new law. While the Guidance provided by the State Department of Education implies that the sign would not be allowed, we will continue to support our teachers who choose to display it in their classrooms."

167.    BSD explained that "The 'Everyone is Welcome Here' sign affirms a foundational principle of public education—that every student, regardless of their background, is legally entitled to dignity, respect, and a sense of belonging in their school community. The sign is a reaffirmation of our legal and ethical obligation to provide an educational environment free from discrimination....Creating an environment where students feel welcome and affirmed is not an ideology—it's our legal duty. We remain committed to upholding that duty."

168.    Welcome Posters are displayed throughout the BSD school system to this day.

169.    Upon information and belief, in addition to West Ada and BSD, the Speech Law is inconsistently applied throughout the state, with some districts allowing certain speech and other districts prohibiting it.

170.    The inconsistent application of the Speech Law across the state places Ms. Inama in legal jeopardy, as her conduct may or may not be punished depending on which school district she teaches at now or in the future.

171.    The Idaho Education Association (IEA), with thousands of members, is the largest organization representing educators statewide, serving as the primary union for public school employees.

172.    IEA freely distributes IEA-branded Welcome Posters on its public-facing website.



173.    Teachers across Idaho have printed and displayed the IEA-branded Welcome Poster in their schools.



174.    Following the BSD Memo and the defiance of teachers concerning the Welcome Poster, Representative Hill spoke to media outlets explaining that "You get into some schools where it's a propaganda indoctrination center…That's where people really get upset about having themselves in public school. And we've gone after that…[I will] go to war with the school boards. You know why? That's the problem, School boards are the problem. They get in there and they act like little emperors in their little empire and they do whatever they think they can."

175.    Along with his "go to war" comment, the news outlet provided an image of Representative Hill from his website that shows him readying what appears to be a M249 Saw light machinegun—a military-style rifle.



A screenshot from a video on Rep. Ted Hill's campaign website.

176. On August 4, 2025, Ms. Inama began a new teaching position at a different school in Idaho.

177. In decorating her new classroom, Ms. Inama once again hung the Posters.

178. Ms. Inama displays the Posters to this day and intends to continue to do so.

## STANDING

179. Ms. Inama remains in jeopardy that the Speech Law, or similar Speech Regulations, will be enforced, thus infringing on her constitutional rights under the First and Fourteenth Amendments to the Constitution and Article I, Section 9 of the Idaho Constitution.

180. While administrators may place restrictions on certain kinds of speech, teachers still enjoy First Amendment protections, including within the classroom.

181. Because the Speech Law places obligations on schools where Ms. Inama works to curtail disfavored speech, it is predictable that Ms. Inama's speech will be regulated and/or that her protected speech will be chilled by self-regulation.

182.    Ms. Inama's First Amendment rights are and were infringed by the Speech Regulations and will continue to be threatened absent relief from this Court.

183.    The injuries described are redressable by a finding that the Speech Law is unconstitutional and thus void.

### FIRST CAUSE OF ACTION
### (IBOE, IDOE, AG LABRADOR)
*Declaratory Judgment: The Speech Law is Unconstitutionally Vague on its Face*

184.    Ms. Inama hereby incorporates by reference, and realleges, all preceding paragraphs.

185.    An actual and justiciable controversy exists between the Parties regarding the constitutionality of Idaho Code § 33-143, so declaratory and injunctive relief is necessary and appropriate to resolve the controversy.

186.    Idaho Code § 33-143 purports to regulate conduct within Idaho's public schools by prohibiting or restricting certain speech, expression, or conduct based on indeterminate, vague, and undefined standards and fails to define critical operative terms, including but not limited to, what is considered "political" or "ideological."

187.    As written, the Speech Law fails to provide fair notice of what conduct is prohibited in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and under Article 1, Section 13 of the Idaho Constitution.

188.    Because it is vague, the Speech Law invites and encourages arbitrary and discriminatory enforcement by granting unfettered discretion to school officials and government actors to ban disfavored speech while promoting government-preferred favored speech.

189.    Because it is vague, the Speech Law creates an unconstitutional chilling effect, whereby teachers must guess at what conduct or utterances may impact their teaching position,

causing them to steer far wider of the unlawful zone, resulting in the muzzling of constitutionally protected speech.

190.    Because the Speech Law is impermissibly vague, it must be declared void on its face and unenforceable.

191.    Ms. Inama is entitled to declaratory relief that the Speech Law is unconstitutional and injunctive relief against further infringement of her Constitutional rights.

### SECOND CAUSE OF ACTION
### (IBOE, IDOE, AG LABRADOR)
### *Declaratory Judgment: The Speech Law is Unconstitutionally Overbroad on its Face*

192.    Ms. Inama hereby incorporates by reference, and realleges, all preceding paragraphs.

193.    An actual and justiciable controversy exists between the Parties regarding the constitutionality of Idaho Code § 33-143, so declaratory and injunctive relief is necessary and appropriate to resolve the controversy.

194.    The Speech Law regulates speech and expressive conduct in the public school setting and, by its plain terms, reaches a substantial amount of constitutionally protected expression.

195.    Teachers have a constitutionally protected right to comment on matters of public concern, which right persists and is not lost at the schoolhouse gate.

196.    The Speech Law is not narrowly tailored to serve a compelling or substantial government interest.

197.    By its breadth, Idaho Code § 33-143 encompasses speech and expression that is protected under the First Amendment of the United States Constitution and the Idaho Constitution, including speech widely considered beneficial and positive in the classroom. For example:

a.  The common meaning of "Political", which is undefined in the Speech Law, is "(1)(a) of or relating to government, a government, or the conduct of government, (b) of, relating to, or concerned with the making as distinguished from the administration of governmental policy; (2) of, relating to, involving, or involved in politics and especially party politics; . . . (4) involving or charged or concerned with acts against a government or a political system." Merriam-Webster Dictionary, *Political*, https://www.merriam-webster.com/dictionary/political (last visited January 17, 2026). This definition is broad enough to encompass matters of public concern including history, foreign and current events, civil rights, current and former wars, and US Supreme Court decisions, all of which could be matters of public concern over which teachers enjoy the constitutional right to engage in free speech.

b.  The common meaning of "Ideological," which is undefined in the Speech Law, is "(1) of, relating to, or based on ideology; (2) relating to or concerned with ideas." Merriam-Webster Dictionary, *Ideological*, https://www.merriam-webster.com/dictionary/ideological (last visited January 17, 2026). To ban flags or banners in a school that are "relating to ideas" is so all encompassing that it could be applied to any subject and could be used to prohibit any quote, phrase, instruction, policy, school mission statements, mottos, or school fight song, as well as ban materials promoting socially desirable outcomes such as abstinence from vices ("don't do drugs"), healthy diet (the inverted or non-inverted food pyramid), equality of the sexes (Rosie the Riveter),  desegregation ("I have a dream"), military service (Uncle Sam), the pledge of allegiance, the

Constitution, and the Declaration of Independence—all are "ideological" under the Speech Law.

    c.  As defined in the Speech Law, and as interpreted by AG Labrador, "Banner" includes any "item… larger than usual regardless of its shape" made of any "material" that is "often," but not always, "displayed in a vertical or horizontal manner" which conveys any "message, symbol, emblem, or representation…." Such a broad definition could conceivably be applied to a large coffee mug with a Boy Scouts of America logo displayed on a desk, a red or pink or yellow ribbon pinned to a bulletin board, or a teacher decorating the classroom with awards and memorabilia recognizing their prior military service. All would be considered a "banner" under the Speech Law and subject to regulation.

    d.  In his Op-Ed, AG Labrador claims the Welcome Poster is political because it now is sold on websites associated with the democratic party. The IEA provides IEA-branded Welcome Posters free for download and has participated in litigation involving the State of Idaho. By censoring speech not because of content, but because of its adoption by an organization disfavored by the government, the Speech Law sweeps in otherwise protected speech. This would include speech regularly found in schools that is associated with entities recently disfavored by the Administration, including PBS and the Corporation for Public Broadcasting who produce "Sesame Street," "Daniel Tiger's Neighborhood," "Super Why!," "Wild Kratts," "Sid the Science Kid," "Clifford the Big Red Dog," and "The Magic School Bus."

198.   The Speech Law's overinclusive language permits enforcement against

constitutionally protected conduct based solely on subjective or viewpoint-based determinations by school officials and government actors.

199.    The Speech Law is unconstitutional on its face due to overbreadth and therefore void and unenforceable.

200.    Ms. Inama is entitled to declaratory relief that the Speech Law is unconstitutional and injunctive relief against further infringement of her Constitutional rights.

### THIRD CAUSE OF ACTION
#### (AG LABRADOR)
*Declaratory Judgment: The Speech Law is Unconstitutionally Vague as Applied*

201.    Ms. Inama hereby incorporates by reference, and realleges, all preceding paragraphs.

202.    An actual and justiciable controversy exists between the Parties regarding the constitutionality of Idaho Code § 33-143, so declaratory and injunctive relief is necessary and appropriate to resolve the controversy.

203.    Ms. Inama is, and was at all relevant times, a public school teacher within the State of Idaho, and displayed the Posters in her classroom to convey inclusivity and belonging—well-settled principles of the fundamental right to education.

204.    The Posters currently are on display in her classroom.

205.    AG Labrador has expressly stated that the Posters violate Idaho Code § 33-143, as the Posters are allegedly political in nature.

206.    With the Posters currently on display, Ms. Inama is in violation of the Speech Law as interpreted by AG Labrador and is subject to having the Posters removed, giving Ms. Inama the option to either remain in peril of enforcement or to abdicate her constitutional rights.

207.    As written and interpreted by AG Labrador, the Speech Law is an

unconstitutionally vague restriction on speech protected by the First Amendment.

208.    In his Op-Ed AG Labrador associated the Welcome Poster to LGBTQ+ messaging, labeling such speech illegal under the Speech Law.

209.    School and West Ada Administrators associated the Welcome Poster to the varying skin tones evident in the hands, and directed Ms. Inama to remove the Posters as a result.

210.    To the extent AG Labrador misperceived the content or meaning of the Posters and/or the intent of the Speech Law, the Speech Law is unconstitutionally vague as applied to Ms. Inama.

211.    The ordered removal of the Posters served no compelling state interest or pedagogical purpose.

212.    As written and as applied to Ms. Inama, and as demonstrated by the varying interpretations of the meaning behind the Speech Law, the Speech Law does not provide fair notice of what conduct is prohibited.

213.    AG Labrador applied the Speech Law in a manner that is impermissibly content and viewpoint-based.

214.    The Speech Law is unconstitutional as applied.

215.    Ms. Inama is entitled to declaratory relief that the Speech Law is unconstitutional and injunctive relief against further infringement of her Constitutional rights.

### FOURTH CAUSE OF ACTION
#### (AG LABRADOR)
*Declaratory Judgment: The Speech Law is Unconstitutionally Overbroad as Applied*

216.    Ms. Inama hereby incorporates by reference, and realleges, all preceding paragraphs.

217.    An actual and justiciable controversy exists between the Parties regarding the

constitutionality of Idaho Code § 33-143, so declaratory and injunctive relief is necessary and appropriate to resolve the controversy.

218.    The Speech Law, as applied to Ms. Inama, regulates expressive conduct protected by the First Amendment of the United States Constitution and the Idaho Constitution.

219.    Ms. Inama exercised her fundamental right to free speech by displaying the Posters in her classroom with the intent to create a welcoming and inclusive environment for her students.

220.    AG Labrador broadly interpreted and applied Idaho Code § 33-143 to prohibit the display of the Posters, making Ms. Inama in violation of the Speech Law.

221.    As applied to Ms. Inama, the Speech Law sweeps far beyond any legitimate governmental interest in regulating classroom instruction and instead reaches a substantial amount of constitutionally protected speech.

222.    The breadth of the Speech Law, as applied, chills Ms. Inama's speech, as she remains in peril of, and reasonably fears, discipline for engaging in speech on matters of public concern and other conduct protected by the First Amendment.

223.    As applied to Ms. Inama, the Speech Law is content and viewpoint-based discrimination which targets Ms. Inama for speaking racially inclusive views.

224.    The Speech Law is not narrowly tailored as applied to serve any compelling or substantial government interests, nor does it employ the least restrictive means of furthering such interest.

225.    Because the Speech Law's application to Ms. Inama infringes protected expressive activity and deters an unlimited amount of lawful speech, the Speech Law is overbroad as applied and should be deemed void.

226.    Ms. Inama is entitled to declaratory relief that the Speech Law is unconstitutional

and injunctive relief against further infringement of her Constitutional rights.

**FIFTH CAUSE OF ACTION**
**(AG LABRADOR)**
*First Amendment Violations*
*42 USC § 1983*

227. Ms. Inama hereby incorporates by reference, and realleges, all preceding paragraphs.

228. The First Amendment to the United States Constitution protects Ms. Inama's right to freedom of speech and teachers do not shed their First Amendment rights at the schoolhouse gate.

229. AG Labrador deprived Ms. Inama of her First Amendment rights when he expressly stated that the Welcome Poster violated Idaho Code § 33-143.

230. AG Labrador publicly ridiculed Ms. Inama in the Op-Ed, calling her constitutionally protected speech "classroom indoctrination" and claimed she was "advancing political messaging."

231. AG Labrador's personal attacks on Ms. Inama for engaging in constitutionally protected speech is an infringement of her First Amendment right to free speech.

232. AG Labrador's public statements against Ms. Inama were made in retaliation to her continuing to engage in constitutionally protected speech.

233. AG Labrador intended his public comments to chill and prevent further speech.

234. Ms. Inama's Posters aligned with expressions of inclusion supported in the School's "Explorer Way" messaging.

235. While the "Explorer Way" materials instruct teachers and students to "welcome others and embrace diversity," AG Labrador has never publicly criticized such materials as "indoctrination," and such materials remain posted throughout the School.

236. AG Labrador's unequal treatment of Ms. Inama's "Everyone is welcome here" message compared to the School's "Welcome others and embrace diversity" message highlights the targeted nature of AG Labrador's attack on Ms. Inama's First Amendment rights in particular.

237. Ms. Inama's First Amendment right to academic freedom and her ability to speak on matters of public concern continue to be infringed by AG Labrador.

238. Ms. Inama is entitled to declaratory relief that the Speech Law is unconstitutional and injunctive relief against further infringement of her Constitutional rights.

239. Ms. Inama is entitled to damages, in an amount to be proven, for the continued infringement.

**SIXTH CAUSE OF ACTION**
**(WEST ADA, SUPERINTENDENT BUB, PRINCIPAL HYDE)**
*First Amendment Violations*
*42 USC § 1983*

259. Ms. Inama hereby incorporates by reference, and realleges, all preceding paragraphs.

260. The First Amendment to the United States Constitution protects Ms. Inama's right to freedom of speech and teachers do not shed their First Amendment rights at the schoolhouse gate.

261. West Ada and its officials, including Superintendent Bub, Principal Hyde, and others repeatedly instructed Ms. Inama to remove the Posters and/or told her that the Posters were in violation.

262. West Ada and its officials, including Superintendent Bub, Principal Hyde, and others repeatedly affirmed that the message "Everyone is Welcome Here", but that the inclusion of hands with differing skin tones is an improper political message requiring censorship of the Welcome Poster within public schools.

263.     The integration and welcoming of students in publicly funded schools regardless of race or ethnicity has been settled law in the United States for generations.

264.     Ms. Inama is legally obligated to welcome students of all races and ethnicities into her classroom.

265.     To the extent West Ada and its officials, including Superintendent Bub, Principal Hyde, and others, required Ms. Inama to remove the Posters because they interpreted the language of the Speech Law as requiring removal of materials affirming established laws surrounding desegregation and integration, these individuals violated Ms. Inama's speech rights.

266.     It cannot be the law that it is against the law to state the law.

267.     The ordered removal of the Posters served no compelling state interest or pedagogical purpose.

268.     The Posters align with expressions of inclusion as adopted by the School with its "Explorer Way" materials to "welcome everyone and embrace diversity".

269.     The "Explorer Way" materials were approved by West Ada, Superintendent Bub, and/or Principle Hyde.

270.     Despite being in line with the "Explorer Way", West Ada and School officials, including Superintendent Bub, Principal Hyde, and others, required Ms. Inama to remove the Posters.

271.     West Ada's and School officials, including Superintendent Bub and Principal Hyde's unequal treatment of Ms. Inama's "Everyone is welcome here" message compared to the School's "Welcome others and embrace diversity" message highlights the targeted nature of the attack on Ms. Inama's First Amendment rights in particular.

272.     At the time Ms. Inama was ordered to remove her Welcome Poster, other teachers

within West Ada were permitted to display the Welcome Poster, and the School continues to allow signage displaying the "Explorer Way."

273.    West Ada and School officials, including Superintendent Bub, Principal Hyde, and others threatened and publicly ridiculed Ms. Inama for exercising her constitutionally protected speech rights, including but not limited to, threatening her with insubordination, pulling her out of her class, criticizing her as not being a "team player" in a district-wide letter, criticizing her on the Ranch Podcast, and making veiled threats that West Ada would not stand by her against online bullying as occurred as part of the Eagle High Lawsuit.

274.    By ordering Ms. Inama to remove her posters and threatening discipline if she refused, Superintendent Bub, Principal Hyde, and other West Ada officials, deprived Ms. Inama of her rights under the First and Fourteenth Amendments to the Constitution.

275.    Ms. Inama is entitled to damages, in an amount to be proven, for the violation of her First Amendment rights under the Speech Policy.

**SEVENTH CAUSE OF ACTION**
**(ALL DEFENDANTS)**
***Declaratory Judgment: The Speech Law Violates the Idaho Constitution***

276.    Ms. Inama hereby incorporates by reference, and realleges, all preceding paragraphs.

277.    An actual and justiciable controversy exists between the Parties regarding the constitutionality of Idaho Code § 33-143, so declaratory and injunctive relief is necessary and appropriate to resolve the controversy. The Idaho Constitution, Article I, Section 9, prohibits the government from abridging a citizen's freedom of speech, writing, and publication.

278.    By requiring Ms. Inama to remove the Posters, while allowing other teachers and school districts to display the same Posters, Defendants violated Ms. Inama's right to freedom of

speech guaranteed by Article I, Sections 9 of the Idaho Constitution.

279.    By enacting policies and interpretations of the Speech Law that chill protected speech, Defendants continue to violate Ms. Inama's Idaho Constitutional rights.

280.    Idaho Code § 33-143 regulates speech and expressive conduct within public schools by restricting the display of certain messages or materials that are protected speech under the Idaho Constitution.

281.    Because the Speech Law lacks clear standards and authorizes arbitrary and capricious enforcement, it violates the Idaho Constitution and is therefore unconstitutional and unenforceable.

282.    Ms. Inama is entitled to declaratory relief that the Speech Law is unconstitutional and injunctive relief against further infringement of her Idaho Constitutional rights.

## FEES AND COSTS

Ms. Inama has engaged counsel to represent her in this matter and is entitled to recover the attorney fees and costs incurred pursuant to Federal Rule Civil Procedure 54, 42 U.S.C. § 1988, and other applicable law. In the event of a default judgment, Ms. Inama should be awarded the attorney fees and costs incurred to date in an amount not less than $10,000.

## DEMAND FOR JURY TRIAL

Ms. Inama demands a trial by a jury of 12 jurors on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Inama prays for relief against Defendants as follows:

1.    That the Court enter judgment in Ms. Inama's favor and against Defendants;

2.    A declaration that Idaho Code § 33-134 violates the United States Constitution on its face and is therefore void and unenforceable.

3.    A declaration that Idaho Code § 33-134 violates the Idaho State Constitution on its face and is therefore void and unenforceable.

4.    A declaration that Idaho Code § 33-134 is unconstitutional as applied to Ms. Inama.

5.    Issue a preliminary and permanent injunction prohibiting Defendants, their officers, agents, employees, and all persons acting in concert with them from enforcing Idaho Code § 33-143 against Ms. Inama or otherwise relying upon it to restrict Ms. Inama's speech or expressive conduct.

6.    For an award of damages in an amount to be proven at trial.

7.    For an award of attorney fees pursuant to 42 U.S.C. § 1988 and any other applicable law.

8.    For such other and further relief in favor of Ms. Inama, in law or equity, that the Court may deem just and proper.


DATED:  February 3, 2026                    DORSEY & WHITNEY, LLP

                                            /s/ Elijah M. Watkins
                                            Elijah M. Watkins
                                            Aaron R. Bell

                                            /s/ Latonia Haney Keith
                                            Latonia Haney Keith

                                            /s/ McKay Cunningham
                                            McKay Cunningham

                                            *Attorneys for Plaintiffs Sarah Inama*